Entered on Docket
February 18, 2009
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes the
Memorandum Decision of the Court.
Signed February 18, 2009

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

In re

MARISSA B. LAMUG and
DAN F. FAMULARCANO,

        Debtors.

Case No. 07-53724-RLE
Chapter 7

**MEMORANDUM DECISION RE MOTION BY UNITED STATES TRUSTEE
TO DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(b)(3)**

Before the Court is the motion by the United States Trustee (the "UST") to Dismiss the chapter 7 bankruptcy case of debtors Marissa Lamug and Dan Famularcano (the "Debtors") pursuant to 11 U.S.C. § 707(b)(3) (the "Motion")[1]. The Motion has been fully briefed and argued and the Court now renders its decision.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedures, Rules 1001-9036, as enacted and promulgated after October 15, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, Apr. 20, 2005, 119 Stat. 23 (hereinafter, "BAPCPA").

## I. INTRODUCTION

The UST has asked this Court to dismiss Debtors' bankruptcy case as an abuse of chapter 7 under § 707(b)(3), based solely on Debtors' apparent ability to pay their debts. The UST concedes that Debtors have "passed" the Means Test and are therefore, not presumed abusive under § 707(b)(2). The UST asserts, however, that Debtors' decision to surrender two parcels of real property, along with other small adjustments, results in disposable income with which Debtors can repay their creditors. The UST further asserts that ability to pay remains a relevant factor for dismissal under the post-BAPCPA § 707(b)(3)(B) totality of the circumstances standard. Thus, the UST contends that the totality of the circumstances demonstrate abuse and Debtors' case should be dismissed.

Debtors, on the other hand, assert that once they "pass" the Means Test, their ability to pay is no longer a valid consideration or basis for dismissal under § 707(b)(3). Debtors also assert that even if ability to pay is still a valid factor in the totality of the circumstances analysis under § 707(b)(3)(B), the facts of this case do not warrant dismissal as an abuse because, among other reasons, Debtors would not be required to pay anything to unsecured creditors under a chapter 13 plan and/or Debtors are not eligible for chapter 13.

The Court finds that: (1) even where debtors are not presumed abusive under § 707(b)(2), ability to pay remains a valid consideration under the totality of the circumstances test of § 707(b)(3)(B); (2) Debtors have an ability to pay their debts;

2

Case: 07-53724   Doc# 44   Filed: 02/18/09   Entered: 02/18/09 14:12:16   Page 2 of 19

(3) considerations regarding whether Debtors would be required to pay anything to creditors in a chapter 13 and/or whether Debtors are eligible for chapter 13 are not relevant considerations for the totality of the circumstances analysis under § 707(b)(3)(B); and (4) the totality of the circumstances of Debtors' financial condition indicate that Debtors' case is an abuse of chapter 7.

**II. FINDINGS OF FACT**

The basic facts of the case appear to be undisputed.

**A. Background**

Debtors filed a voluntary chapter 7 bankruptcy petition on November 14, 2007.

**B. Debts**

Debtors are individuals with primarily consumer debts. Their scheduled unsecured debts total $92,220.[2] Their scheduled secured debts total $1,046,910, and are secured by two parcels of real property and one vehicle. Debtors did not schedule any priority debt.

**C. Properties**

On the filing date, Debtors owned a residence located at 2111 Pruneridge Avenue in Santa Clara, California (the "Pruneridge Property") and a rental property located at 5448 Mead Stone Way in Sacramento, California (the "Sacramento Property") (together, the "Properties"). The Properties were overencumbered and Debtors had not made payments on the mortgages since June and August of 2007, respectively. Debtors' Statement of Intention indicated their intent to surrender the Properties.

---

[2]All figures have been rounded to the nearest dollar.

3

An order granting relief from stay as to the Pruneridge property was entered on January 7, 2008. An order granting relief from stay as to the Sacramento Property was entered on January 11, 2008. The record does not indicate the current status of the Properties.

**D. Means Test**

Debtors' Means Test form shows negative monthly disposable income of ($3,054) per month. Thus, the presumption of abuse does not arise.

**E. Schedule I Income**

On the filing date, Debtors were both employed. Ms. Lamug worked 24 hours per week as a nurse at Kaiser Permanente and had gross income of $6,184 per month. She had been employed at this job for four years. Mr. Famularcano worked full-time as a technician at Automation Controls and his gross income was $3,423. He had been employed at this job for eight years. Debtors' combined gross income was $9,606. Ms. Lamug also had a second job at V.H. Holdings, which netted Debtors $928 per month.[3] Debtors' gross income before taxes was $10,535. Debtors' net income, after taxes and a $172 401k deduction totaled $8,226.

**F. Schedule J Expenses**

Debtors' amended schedule J reflects $10,508 in expenses,

---

[3] Ms. Lamug quit her second job at V.H. Holdings on January 7, 2008. Subsequently, she increased her hours at Kaiser to at least 32 hours per week. It appears that the income from Ms. Lamug's additional hours at Kaiser is at least as much as, and maybe more than, the income from her part-time job at V.H. Holdings. Because the UST has not done an updated calculation and Debtors have not filed an amended schedule I, the Court assumes the difference is negligible and relies on the income information in the schedule I, as filed.

4

including payments of $6,007 on the Pruneridge Property, payments of $2,201 on the Sacramento Property and $190 in utilities (i.e., gas, electric, water and sewer ("Utilities")).

On October 12, 2007, Debtors entered into a lease to rent a single family home for $1,800, plus $140 per month for Utilities (the "Rental Property"). On November 15, 2007 (the day after the bankruptcy filing), Debtors moved out of the Pruneridge Property and into the Rental Property. Debtors have not amended schedule J to remove the mortgages that they no longer pay on the Properties, or to replace the mortgages with the monthly rent and Utlities they currently pay on the Rental Property.

**G.  UST's Proposed Adjustments to Income and Expenses**

Debtors' schedules I and J reflect net income of ($2,283). The UST asserts that if adjustments are made to reflect actual and necessary expenses and tax withholdings, Debtors have disposable income of approximately $3,489 per month.

The UST asserts the following reductions should be made to Debtors' expenses: (1) reduction of the mortgage/housing expense from $6,007 (mortgage on the surrendered Pruneridge Property) to $1,800 (the actual rent on the Rental Property); (2) elimination of the $2,201 in first and second mortgage payments on the surrendered Sacramento Property; and (3) reduction of the Utilities expense from $190 (as listed on schedules), to $140 (the actual amount paid under the Rental Property lease). With these adjustments, the UST asserts that Debtors' actual monthly expenses will total $4,051 (the "Adjusted Expenses").

The UST does not challenge the $10,535 in gross income on schedule I, but recommends two adjustments to the net income:

5

(1) eliminating the 401k account deduction; and (2) increasing Debtors' payroll taxes from $2,137 to $2,995 to reflect the fact that Debtors will no longer have a mortgage interest deduction as a result of the surrender of the Properties and to reflect the proposed elimination of the 401k contribution. With these adjustments, the UST contends that Debtors' actual monthly income totals $7,540 (the "Adjusted Income"). The UST contends that subtracting Adjusted Expenses from the Adjusted Income results in monthly disposable income of $3,489.

## III. DISCUSSION

### A. Dismissal Under § 707(b), Generally

Section 707(b)(1) provides that a case of an individual debtor whose debts are primarily consumer debts may be dismissed if the court finds, after notice and a hearing, that granting a discharge would be an abuse of chapter 7.[4] Section 707(b) provides two methods under which to determine if "abuse" is present: (1) presumed abuse under the objective Means Test prescribed in § 707(b)(2); and (2) the more subjective test found in § 707(b)(3), which is based on a debtor's good faith and/or the totality of the

---

[4] Section 707(b)(1) states, in pertinent part,

> After notice and a hearing, the court, . . . on motion by the United States trustee. . . or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts. . . if it finds that the granting of relief would be an abuse of the provisions of this chapter[.]

Under BAPCPA, the statutory standard for dismissal under § 707(b) has been lowered from the pre-BAPCPA standard of "substantial abuse," to mere "abuse." In re Maya, 374 B.R. 750, 754 (Bankr. S.D. Cal. 2007). In addition, BAPCPA has deleted the pre-BAPCPA presumption in favor of granting relief to debtors. In re Booker, 2009 WL 160252 *1 (Bankr. W.D. Mo. Jan. 23, 2009); In re Kaminski, 387 B.R. 190, 194-95 (Bankr. N.D. Ohion 2008).

6

circumstances.

The function of the Means Test under § 707(b)(2) is to estimate the ability of a chapter 7 debtor to repay his or her debts. In re Baeza, 2008 WL 5411118 *2 (Bankr. E.D. Cal. Dec. 29, 2008). If a debtor's annualized income exceeds the applicable median family income, and application of the comprehensive list of allowable expenses shows that debtor has the ability to repay the lesser of a percentage of his or her nonpriority unsecured debts, or a sum certain over a five year period, a presumption of abuse arises. 11 U.S.C. § 707(b)(2).

Section 707(b)(3), on the other hand, offers a more subjective test that requires a case-by-case analysis of a debtor's financial situation and course of conduct to determine abuse. In re Baeza, 2008 WL 5411118 *2; In re Kaminski, 387 B.R. 190, 195 (Bankr. N.D. Ohio 2009) (citation omitted)). Specifically, § 707(b)(3) provides,

> In considering . . . whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption [of abuse]. . . does not arise or is rebutted, the court shall consider-
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The UST has not brought a motion under § 707(b)(2) and does not argue that the presumption of abuse applies. Nor does the UST argue that Debtors have engaged in bad faith under § 707(b)(3)(A). Instead, the only argument advanced by the UST is that the totality of circumstances show abuse under § 707(b)(3)(B). The burden of

7

proof on this matter is on the UST. <u>Hebbring v. U.S. Trustee</u>, 463 F.3d 902, 909 (9th Cir. 2006).

### B. Relationship Between § 707(b)(2) and § 707(b)(3)

As an initial matter, Debtors argue that under BAPCPA, the § 707(b)(2) Means Test is the exclusive test of Debtors' ability to pay and, once Debtors pass the Means Test, the UST is precluded from arguing ability to pay under the totality of the circumstances provision of § 707(b)(3)(B). The Court disagrees.

Section 707(b)(3) clearly states that when the § 707(b)(2) presumption of abuse does not arise, or is rebutted, the Court ***shall*** consider whether the totality of the circumstances of the Debtors' financial situation demonstrates abuse. 11 U.S.C. § 707(b)(3)(B). Here, there is no dispute that Debtors "passed" the § 707(b)(2) Means Test. Thus, under the plain language of the Code, the Court is required to take the next step and determine whether abuse is present. <u>In re Baeza</u>, 2008 WL 5411118 at *3 (citing <u>In re Paret</u>, 347 B.R. 12 (Bankr. D. Del. 2006) and Eugene R. Wedoff, <u>Means Testing in the New § 707(b)</u>, 79 Am. Bankr. L.J. 231, 236 (2005)); <u>In re Maya</u>, 374 B.R. 750, 754 (Bankr. S.D. Cal. 2007). To answer that question in this case, the Court must determine the threshold issue; whether the "totality of the circumstances" analysis under § 707(b)(3)(B) includes an inquiry into Debtors' "ability to pay."

### C. § 707(b)(3)(B) and Totality of the Circumstances

The Bankruptcy Code does not define "totality of the circumstances" and there is little case law, and no binding case law, on the post-BAPCPA meaning of the phrase. Despite this lack of authority, however, various sources provide this Court with

8

guidance for interpreting the phrase.

First, the plain language of the statute directs the Court to consider the "totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of [Debtors'] financial situation." 11 U.S.C. § 707(b)(3)(B). Debtors' actual current and future income and expenses, intentions, and resulting ability or inability to pay are crucial to an assessment of Debtors' "financial situation." In re Booker, 2009 WL 160252 *3 (Bankr. W.D. Mo. Jan. 23, 2009); See also In re Baeza, 2008 WL 5411118 *5 (finding that plain language of statute requires court to consider debtor's actual financial situation at time of filing); In re Maya, 374 B.R. at 754 (citing language of statute to support conclusion that court may rely on post-petition events to determine ability to pay, debtors may not rely on payments and expenses they surrender post-petition, and citing cases that have considered post-petition events in a § 707(b)(3)(B) analysis).

Second, the majority of courts that have conducted a post-BAPCPA § 707(b)(3) analysis have utilized pre-BAPCPA case law and concluded that a debtor's ability to pay creditors out of future disposable income remains a sufficient basis to support a finding of abuse. See In re Booker, 2009 WL 160252 *2-3 (analyzing pre-BAPCPA case law to conclude consideration of actual ability to pay is primary, if not exclusive, consideration under post-BAPCPA § 707(b)(3) and listing cases that find similarly); In re Baeza, 2008 WL 5411118 (analyzing pre-BAPCPA case law and concluding ability to pay debts from future income, standing alone, is sufficient for finding of abuse under § 707(b)(3)(B)); In re

Case: 07-53724   Doc# 44   Filed: 02/18/09   Entered: 02/18/09 14:12:16   Page 9 of 19

Hickman, 2008 WL 2595182 *6 (Bankr. W.D. Wash. June 27, 2008 (citing pre-BAPCPA case law and listing post-BAPCPA cases that hold that ability to pay out of future disposable income is sufficient to support a finding of abuse under § 707(b)(3)(B)); In re Talley, 389 B.R. 741, 743 (Bankr. W.D. Wash. 2008) (citing In re Stewart, 383 B.R. 429, 432 (Bankr. N.D. Ohio 2008) and concluding that post-BAPCPA § 707(b)(3)is "best understood as a codification of pre-BAPCPA case law," and therefore, pre-BAPCPA case law is still relevant when determining whether to dismiss a case for abuse under post-BAPCPA § 707(b)(3)); In re Maya, 374 B.R. at 754 (utilizing pre-BAPCPA case law to conclude that post-BAPCPA, ability to pay may support dismissal of a case under § 707(b)(3) and citing cases that find similarly); In re Pak, 343 B.R. 239 (Bankr. N.D. Cal. 2006) (reasoning, "prior to BAPCPA courts considered whether to dismiss a . . . case for 'substantial abuse' under § 707(b)(1) based on the 'totality of the circumstances.' All courts considered the debtor's ability to pay to be an important factor in this context. It would be counterintuitive to construe this same phrase, as used in BAPCPA, to exclude a consideration of the debtor's ability to pay."); but see, In re Walker, 381 B.R. 620, (Bankr. M.D. Pa.2008) (utilizing canon of negative implication to conclude that a debtor who has passed the Means Test is not required to withstand a second examination of schedule I and J income and expenses under § 707(b)(3)).

Finally, it is a well-established rule of statutory construction, that "where Congress uses terms that have accumulated settled meaning under . . . common law, a court **must** infer, unless the statute otherwise dictates, that Congress means to incorporate

10

the established meanings of these terms." Neder v. U.S., 527 U.S. 1, (1999) (citations omitted) (emphasis added); see also In re Oot, 368 B.R. 662 (Bankr. N.D. Ohio 2007) (It is a "fundament of statutory construction that, where Congress codifies prior case law, those prior holdings remain not only good law, but should serve as a valuable touchstone for interpreting the statute."). Because neither the Code, nor post-BAPCPA § 707(b)(3)(B) "otherwise dictates," this Court must infer that Congress meant to incorporate the established meanings of the term "totality of the circumstances."

Pre-BAPCPA in the Ninth Circuit, the meaning of the phrase "totality of the circumstances" was well-settled. Under the former § 707(b), courts in the Ninth Circuit looked to the "totality of the circumstances" to determine whether substantial abuse was present. In re Price, 353 F.3d 1135, 1139 (9th Cir. 2004). Various non-exclusive factors were considered when reviewing the totality of the circumstances under pre-BAPCPA § 707(b), including:

(1) Whether the debtor had a likelihood of sufficient future income to fund a Chapter 11, 12 or 13 plan which would pay a substantial portion of the unsecured claims;

(2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;

(3) Whether the schedules suggested the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;

(4) Whether the debtor's proposed family budget was excessive or extravagant;

11

> (5) Whether the debtor's statement of income and expenses was misrepresentative of the debtor's financial condition; and
>
> (6) Whether the debtor had engaged in eve-of-bankruptcy purchases.

Id. at 1139-40. In the Ninth Circuit, it was also well-settled that a debtor's ability to fund a Chapter 11, 12 or 13 plan to pay his or her debts, standing alone, justified a § 707(b) dismissal. Id. at 1140 (citing Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914 (9th Cir. 1988)).

The phrase "totality of the circumstances" was well-settled prior to the passage of BAPCPA. If Congress intended for the phrase to have a meaning other than the established meaning, Congress could have defined the phrase, used a different phrase, or qualified the phrase in some way. Either intentionally or unintentionally, Congress did not do so. Because Congress used a phrase that was well-settled pre-BAPCPA, and nothing in BAPCPA indicates that courts are now required to give a different meaning to the phrase, this Court finds that: (1) the phrase continues to have the same settled meaning post-BAPCPA; (2) ability to pay remains a legitimate consideration under the post-BAPCPA § 707(b)(3)(B) totality of the circumstances test; and (3) ability to pay, standing by itself, remains a sufficient ground to support a finding of abuse under post-BAPCPA § 707(b)(3)(B).

**D. Application to the Specific Facts of This Case**

The parties agree that Debtors can satisfy a majority of the Price factors. There is no evidence that Debtors engaged in eve-of-bankruptcy purchases or that Debtors obtained cash advances and

consumer goods on credit exceeding their ability to repay them. Further, while there is no evidence that Debtors' petition was filed as a result of illness or disability, there is some evidence that Debtors incurred a portion of the debt they seek to discharge in dealing with family illness and emergencies.

On the other hand, Debtors have enjoyed and continue to enjoy a stable income that is substantially more than the applicable median family income in California. In addition, as a result of their decision to surrender the Properties and move into the Rental Property, Debtors are no longer burdened with mortgage payments in excess of $8,000 per month. Instead, they have replaced these $8,000 in payments with payments totaling approximately $2,000. As a result, as discussed in more detail below, it does appear that based on their current financial condition, Debtors have an ability to repay a substantial portion of their unsecured debt.

### 1. Housing/Real Property/Utilities Expenses

The UST asserts that Debtors' mortgage/rental expenses should be adjusted to reflect the fact Debtors have not made payments on the Properties since before the bankruptcy, have lost or will lose the Properties to foreclosure, have replaced the Properties with the Rental Property, and now only pay rent of $1,800 per month. The UST also asserts that Debtors' Utilities should be reduced to reflect the actual amount they must pay under the terms of the Rental Property lease. Debtors disagree, alleging that the UST's proposed adjustments are unreasonable because they do not conform with the IRS standards used in the Means Test.

Debtors do not cite, and the Court is not aware of, any authority for the proposition that in a § 707(b)(3)(B) analysis,

the IRS standards control, thereby rendering Debtors' actual
expenses irrelevant or "unreasonable."  In fact, the plain language
of § 707(b)(3)(B) requires the Court to consider the Debtors'
actual financial situation.  See In re Baeza, 2008 WL 5411118 *5
(Bankr. E.D. Cal. December 29, 2008) ("By the plain meaning of
§ 707(b)(3)(B), the court must consider the Debtors' actual
financial situation"); In re Kaminski, 397 B.R. at 196 (finding
that while IRS standards may be helpful in determining
reasonableness of expenses, "[a]s a matter of purely statutory
application, the IRS [standards] are not applicable in a
§ 707(b)(3) analysis").  Further, while the IRS standards may be
relevant or helpful to determine reasonableness in some cases, they
are all but irrelevant in a case such as this, where it was Debtors
themselves who determined the reasonableness of their housing
expenses by replacing the Pruneridge Property with the Rental
Property pre-petition.  This is not a situation where the UST is
attempting to impose a fictional "reasonable" housing expense on
Debtors.  The rent on the Rental Property is the **actual** amount that
Debtors **voluntarily** contracted to pay for housing that they
believed was suitable, prior to their bankruptcy filing and prior
to any review by the UST or this Court.  Thus, the Court agrees
with the UST and finds that Debtors' mortgage/rental expenses
should be reduced from $8,208 to $1,800 and their Utilities should
be reduced from $190 to $140, to reflect Debtors' actual post-
petition housing and utility expenses.

### 2. Tax Withholdings

The UST also contends that in calculating Debtors' ability to
pay their debts, Debtors' withholding taxes must be increased from

$2,309 to $2,995, to reflect the fact that Debtors will no longer benefit from an itemized deduction for home mortgage interest.[5] The increase in withholding taxes also assumes that this Court will not permit Debtors to continue contributing to a 401k account, thereby increasing Debtors' gross income and appropriate tax withholding amount. Debtors have not disputed the UST's proposed increase, nor have they provided their own figures. As the withholding tax increase benefits Debtors by decreasing their monthly net income, the Court finds this increased amount to be equitable and appropriate in determining Debtors' ability to pay.

### 3. Contribution to 401k Account

Finally, schedule I indicates that Mr. Famularcano contributes $172 per month to a 401k account. The UST asserts that Debtors' 401k contribution should not be permitted as it is, in effect, a payment by Debtors, to themselves, of funds that could be used to pay creditors. Thus, the UST suggests increasing Debtors' income by the amount that Debtors contribute to a 401k account each month. The Debtors disagree, arguing that the contribution is necessary as they are nearing retirement age, have two children and their existing retirement accounts total less than $20,000.

In the Ninth Circuit, bankruptcy courts have discretion to determine whether retirement contributions are a reasonably necessary expense for a particular debtor, based on the specific facts of each individual case. Hebbring v. U.S. Trustee, 463 F.3d at 907 (citation omitted). The determination is fact-specific and

---

[5] Per the UST Bankruptcy Analyst, the UST computed the tax amount using an independent payroll tax calculator. The calculated amount is based on a filing status of married with two dependents.

15

Case: 07-53724   Doc# 44   Filed: 02/18/09   Entered: 02/18/09 14:12:16   Page 15 of 19

the Ninth Circuit utilizes a non-exclusive list of factors to consider in making this determination. Id. Ultimately, "[c]ourts must allow debtors to seek bankruptcy protection while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents." Id.

Here, the Court declines to make any specific findings as to the reasonableness or necessity of Mr. Famularcano's 401k deduction because it is not necessary to the Court's ruling. Assuming *arguendo*, that the Court were to find that Debtors' 401k deduction is reasonable and necessary, the Court's ultimate conclusion is unchanged, as discussed below.

### 4. Debtors have an Ability to Repay

After making adjustments to Debtors expenses to only allow actual housing and Utility expenses, Debtors' actual monthly expenses total $4,051. Adjusting Debtors' withholding taxes as suggested by the UST and allowing Debtors to continue making their 401k deduction results in monthly income of approximately $7,368. Even with a 401k deduction, therefore, Debtors have approximately $3,317 in monthly disposable income which could be used to pay creditors.[6] This amount is substantial as Debtors could pay 100% of their unsecured debt in less than 28 months. Thus, the totality of the circumstances of Debtors' financial condition indicate that Debtors have an ability to repay their debts.

---

[6]The Court recognizes that if Debtors are permitted to continue the 401k contribution, their pre-tax income would decrease, thereby reducing their withholdings to below the $2,995 amount calculated by the UST. Given, however, that the 401k deduction is minimal, the net effect to the withholdings would likely also be minimal.

**E. Impact of <u>In re Kagenveama</u> on Court's Analysis**

Debtors argue that their case is not an abuse because under the recent Ninth Circuit case <u>In re Kagenveama</u>, 541 F.3d 868 (9th Cir. 2008), Debtors would not be **required** to pay anything to unsecured creditors in a chapter 13. Debtors mischaracterize the issue and, in doing so, put the proverbial cart before the horse.

This is a motion to dismiss; no less and no more. Any discussion about what would happen in another chapter is purely hypothetical. In deciding the Motion to Dismiss, the relevant question for the Court is not whether Debtors would be **required to pay anything in a chapter 13 case**, but whether the totality of the circumstances of Debtors' financial condition **in this chapter 7 case show an ability to repay** their debts. Nothing in the text of § 707(b)(3)(B) requires the Court to anticipate what would happen if Debtors converted to chapter 13. In fact, § 707(b)(3)(B) neither mentions, nor refers to chapter 13, or any other chapter under the Code. Going down the road Debtors suggest, and unilaterally expanding § 707(b)(3)(B) to include such an inquiry, would necessarily require the Court to anticipate not only what Debtors would be required to pay if they decided to convert to or file a chapter 13 case, but also whether Debtors would be eligible for chapter 13, what the chapter 13 trustee and creditors would do if Debtors were in chapter 13, what would happen if Debtors decided to file a chapter 11 instead, whether Debtors would be required to pay anything in a chapter 11 case, what would happen if Debtors decided not to refile and whether state anti-deficiency statutes would apply. The list of scenarios that may or may not ever occur and issues that may or may not ever arise, but that the Court would

have to anticipate, decide, and issue an advisory opinion on, is potentially endless. Nothing in the text of § 707(b)(3)(B) indicates that this was the type of inquiry envisioned by Congress.

The only question raised by § 707(b)(3)(B) and the only question in front of the Court, at this time, is whether the totality of the circumstances of Debtors' financial condition indicates abuse and supports dismissal. Because the Debtors have an ability to pay their debts, the Court finds that it does.

**IV. CONCLUSION**

Based on the foregoing, the Court finds and concludes, based on the totality of the circumstances, that Debtors have the ability to pay a substantial portion of the debts for which they seek a discharge and, as a result, granting Debtors a discharge under the facts of this case would be an abuse of chapter 7. Accordingly, the UST's Motion is granted. Debtors' case will be dismissed with a ten-day stay to allow Debtors the opportunity to convert their case to a case under another appropriate chapter, if they so choose. A separate order shall issue.

**Case No. 07-53724**

Court Service List - by U.S. mail and/or ecf:

Marissa Lamug and Dan Famularcano
2111 Pruneridge Ave
Santa Clara, CA 95050

Marissa Lamug and Dan Famularcano
4114 Gheeney Street
Santa Clara, CA 95050

Drew Henwood
Law Offices of Drew Henwood
41 Sutter St. #621
San Francisco, CA 94104

John S. Wesolowski, Esq.
Office of the U. S. Trustee
280 So. First Street, Rm. 268
San Jose, CA 95113-3099

Carol Wu
25A Crescent Dr. #413
Pleasant Hill, CA 94523

**and any other parties requesting special notice**